THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v.
LAMONT G. THOMAS, Defendant-Appellant.

Second District   Nos. 2—89—0711, 2—89—1016 cons.

Opinion filed October 21, 1991.

G. Joseph Weller and Paul J. Glaser, both of State Appellate Defender's Office, of Elgin, for appellant.

Gary V. Johnson, State's Attorney, of Geneva (William L. Browers and Mary Beth Burns, both of State's Attorneys Appellate Prosecutor's Office, of counsel), for the People.

JUSTICE UNVERZAGT delivered the opinion of the court:
Following a jury trial, defendant, Lamont Thomas, was found guilty of unlawful possession of a hypodermic needle (Ill. Rev. Stat.

1987, ch. 38, par. 22—50) in the circuit court of Kane County and sentenced to one year in the Kane County jail. Following his conviction, defendant was ordered, pursuant to section 5—5—3(h) of the Unified Code of Corrections (Ill. Rev. Stat. 1987, ch. 38, par. 1005—5—3(h)), to undergo testing to determine whether he had been exposed to acquired immunodeficiency syndrome (AIDS). Defendant refused to comply with the court's order and, subsequent to a hearing on the State's petition for rule to show cause, was found to be in civil contempt.

In a consolidated appeal, defendant appeals from the conviction of possession of a hypodermic needle and the finding of contempt, contending: (1) that the trial court's evidentiary rulings denied him a fair trial; (2) that the jury improperly based its verdict on a comment by the trial judge; (3) that the AIDS testing statute (Ill. Rev. Stat. 1987, ch. 38, par. 1005—5—3(h)) is unconstitutional; and (4) that the trial court erred in finding defendant in contempt for failing to comply with the court's testing order.

Prior to trial, the court denied defendant's motion *in limine* to prohibit the State from introducing defendant's prior robbery and theft convictions at trial. Additionally, the court denied defendant's request to "sanitize" these convictions by referring to them only as "felonies" rather than by their specific names.

The State moved *in limine* to keep out any reference by defendant to the aggravated criminal sexual assault charge with which defendant had been charged contemporarily with the possession of a hypodermic needle charge. Upon motion by defendant, the two charges had been severed for trial, and defendant had been found not guilty of the assault charge prior to the instant trial. The trial court granted the State's motion *in limine*.

The following facts were adduced at trial.

At about 6:45 a.m. on December 8, 1988, Officer William Powell of the Aurora police department spoke with a young woman at PADS (a public housing shelter) in Aurora regarding an offense that occurred at an earlier time and date. The woman advised Powell that a suspect of that offense was at PADS, and she pointed out defendant. Powell testified that defendant was seated, facing the officer, at a table inside the shelter with several other people. Approximately 75 people were present at PADS. Defendant had in his possession a plastic shopping bag and a cloth, three-quarter-length coat which was partially on his lap. According to Powell, defendant was watching him and appeared to be pushing the coat away from himself. It was Powell's testimony that his vision of defendant was

unobstructed and that he did not recall any other individuals attempting to retain the coat or claim it as theirs. Powell approached defendant and informed him that he was going to be taken to the police station for questioning on the earlier offense. One of the other officers with Powell patted down defendant at PADS. Powell did not see the other officer recover anything from defendant. Powell did not recall how the coat got to the station, but he knew defendant did not bring it.

At the station defendant's personal property was inventoried. Officer Powell searched defendant's coat and found a hypodermic needle and syringe, approximately five inches in length, in the right pocket. The officer identified State's exhibit No. 2, the syringe and needle, which was admitted into evidence. Powell stated that when he pulled out the syringe and needle, he informed the officers near him of his find.

On cross-examination, Powell agreed that the hypodermic needle and syringe were designed to go under the skin and inject something into the bloodstream. The officer did not submit the syringe or needle to the crime lab for analysis because it was not used in a crime, nor did he attempt to get fingerprints off the syringe part.

Officer Michael Leon was also at PADS on the morning of December 8, 1988. According to Leon, he and his partner, Officer Podschweit, received the initial call (to proceed to PADS), and Officer Powell met them there. By Leon's estimate, 15 people were in the cafeteria room of the building when the officers arrived. Leon did not recall that anyone else was sitting with defendant at his table, nor did he recall whether the coat in question was on defendant's lap or next to him. Leon did remember that the coat was within defendant's reach and that he and Podschweit transported it to the station. Before placing defendant in the squad car, the officers conducted a pat-down search of defendant for weapons. At the station Leon observed Powell conduct an inventory search of defendant. Powell recovered miscellaneous papers from the defendant's pocket and a hypodermic needle. Leon did not specifically remember where the needle was found.

At the conclusion of the State's case in chief, defendant moved for a directed verdict which was denied. Defendant then called Officer Powell as a witness. Defendant showed Powell defendant's exhibit No. 1, the police report Powell made on December 8, 1988. Powell admitted that nowhere in his report did he mention a coat.

On cross-examination the officer acknowledged that he included in his report that the hypodermic needle was taken from "a right pocket" of defendant. The report did not mention from which article of clothing the needle was removed.

Defendant, Lamont Thomas, testified that at about 4 a.m. on December 8, 1988, he went to PADS because he had been drinking, and it was too late to go home. On that date he was, by his own testimony, wearing a gray, Hart Schaffner & Marx corduroy matching pants and jacket. Defendant stated that when he arrived at PADS, a staff member put defendant's coat in a closet although defendant could have taken the coat with him when he went to lie down. Defendant related that he slept until about 6 a.m. at which time he was awakened for breakfast. After he washed up, defendant retrieved his coat from the closet and then put it on the back of a chair in front of the counselor's desk. According to defendant, somebody sat where he put his coat so he sat somewhere else and ate his breakfast. It was defendant's testimony that he did not grab his coat and take it with him but, rather, just left it on the chair.

Defendant stated that when he sat down, he was about 20 feet from his coat and that he could not see it at all times because of a pillar in the room and because of people's movements in the room. Defendant testified that there were coats on the backs of all the chairs, including his chair. He did not recall what the coat on the back of his chair looked like.

Defendant recalled that two officers arrived at PADS at 6:45 a.m. The officers were there about six or seven minutes before they approached defendant. According to defendant, they picked defendant up by the collar of his shirt, searched him, and took some paper work, a gold earring, and a wallet from him. Defendant said the officers went through bags of clothes by the table, lifted up coats, and scooted chairs. It was defendant's testimony that the officers then led him into a hallway, searched him again, handcuffed him, and put him in a squad car.

Defendant testified that he did not see the officers carry anything out of PADS, nor did they have any articles of clothing with them in the squad car. Defendant stated that he had no items of clothing with him when he was transported to the police station except for the shirt, slacks, shoes, and socks he was wearing at the time. According to defendant, he did not take his gray corduroy jacket with him, nor did he tell the officers that he wanted to get his jacket. It was defendant's explanation that he did not tell the officers about his jacket because they told him to shut up.

Defendant stated that he was searched again at the police station. One officer then disappeared and returned with a coat, a black windbreaker, which he put on the booking counter. Officer Powell and the two officers who had transported defendant to the station had a conversation. It was defendant's testimony that the two officers then searched defendant a fourth time and that during this search defendant heard something hit the floor. Defendant said that it sounded like an ink pen had been dropped, but he did not see the object. Later, according to defendant, he saw an officer holding the object, a hypodermic syringe. Defendant denied ever having the hypodermic syringe in his possession that night.

At the conclusion of defendant's testimony, defense counsel asked to admit Officer Powell's written police report as a prior inconsistent statement under section 115—10.1 of the Code of Criminal Procedure of 1963 (Ill. Rev. Stat. 1987, ch. 38, par. 115—10.1). The court commented that Powell admitted everything that was in the report (during his testimony) and that under those circumstances the report was not admissible (as a prior inconsistent statement).

The court then asked the State if it had any rebuttal, and the State called Officer Powell. Powell stated that no officers grabbed defendant by the shirt collar at PADS or threw him around, as defendant had testified. Contrary to defendant's testimony, Powell said that defendant was searched only twice. Powell related that a pat-down search of defendant for weapons was conducted outside PADS before defendant was placed in the squad car, and an inventory search was made at the police station. Powell testified that he did not hear anything fall out of defendant's pockets during the inventory pat down.

Powell again described defendant's coat as a three-quarter-length cloth coat. Powell believed the coat was brown but was not certain of the color.

The State also called Officer Leon in rebuttal. Leon's testimony was similar to Powell's. Leon stated that no one grabbed defendant by the collar at PADS or threw him around, that defendant was searched for weapons before being placed in the squad car and then once again at the police station, and that during the search at the station the officer did not hear any object hit the floor. Leon recalled that in addition to the clothing defendant was wearing he had a coat with him at PADS although the officer did not remember the color of the coat or the type of fabric.

The State then tendered into evidence certified copies of defendant's 1984 convictions of "the felony offense of robbery," "theft, [a] class four felony," and "theft, a Class A misdemeanor." In rebuttal, defendant testified that he had pleaded guilty to those offenses because he was guilty, whereas he had pleaded not guilty to the instant offense of unlawful possession of a hypodermic needle because he was not guilty.

Following deliberations, the jury found defendant guilty of the offense of unlawful possession of a hypodermic needle. Before the jury was discharged, the court inquired why the jury had made a request to see the hypodermic needle. The foreperson explained that there was some question among the jurors regarding whether there was in fact a needle attached to the hypodermic syringe. A discussion ensued regarding that fact during which the hypodermic needle and syringe were shown to the jurors. Both defense counsel and the prosecutor were present at the time, and neither expressed any objection to the court's display of the needle and syringe to the jury.

At the sentencing hearing the State sought the maximum term of 364 days in the county jail. The State also asked the court to order defendant to undergo AIDS testing pursuant to section 5—5—3(h) of the Unified Code of Corrections (Ill. Rev. Stat. 1987, ch. 38, par. 1005—5—3(h)). Defendant had filed a motion, declaring section 5—5—3(h) unconstitutional. The court postponed sentencing until after defendant and the State each had submitted a memorandum on the constitutionality issue. Subsequently, after reading each party's memorandum and hearing oral arguments on the issue, the court denied defendant's motion to declare the statute unconstitutional. The court sentenced defendant to one year in the county jail and ordered him to undergo blood testing for AIDS not later than July 5, 1989.

On July 21, 1989, the State filed a petition for a rule to show cause why defendant should not be held in civil contempt for refusing to comply with the court's blood-testing order. At a subsequent hearing on the State's rule to show cause the State called as a witness Doris Esgeny, a nurse with the Kane County sheriff's department. Esgeny testified that on July 11, 1989, defendant was brought to the nursing facilities at the jail. Esgeny related that she explained to defendant that she had a court order to obtain a blood sample. Defendant refused to submit to the blood test.

Wayne Bartlett, a deputy with the Kane County sheriff's department, also testified on the State's behalf. Bartlett stated that

he accompanied defendant to the nursing facilities on July 11, 1989. Bartlett recalled that Nurse Esgeny informed defendant that she had an order to draw some blood for a blood test, but defendant refused to submit to the test so Bartlett returned him to the county jail.

Defendant testified on his own behalf, stating that no requests for a blood test were made prior to July 11. Defendant stated that he refused to take the blood test because he felt it was unconstitutional to have to submit to the test and because he did not want anyone "extracting bodily fluids from my body against my will."

The court reiterated that the statute ordering the blood test, section 5—5—3(h), is constitutional. The court held defendant in civil contempt for refusing to submit to the test and ordered defendant confined to the county jail until such time as he submitted to the test. This appeal ensued.

Defendant first contends that the trial court's evidentiary rulings denied him a fair trial. Specifically, defendant maintains that the court's refusal to employ the "mere fact" method for impeachment of defendant, its refusal to allow the jury to learn that defendant had been acquitted on the charge which caused his arrest, and its refusal to allow the introduction of a police report as a prior inconsistent statement combined to deny him a fair trial.

■ Relying on Justice Steigmann's special concurrence in *People v. Kunze* (1990), 193 Ill. App. 3d 708, defendant argues that the "mere fact" rule for impeachment should have been applied in the instant case, *i.e.*, the jury should have been informed only that defendant was convicted of prior felonies and not told of the specific nature of those felonies. Defendant contends that, by informing the jury that he had prior convictions of robbery and theft, the jury was not only given a reason to question defendant's credibility but also allowed to speculate as to a possible motive for the possession of a hypodermic needle and syringe since the unlawful taking of property is often viewed as a means to support illegal drug use. It is defendant's position that by refusing to grant defendant's pretrial motion *in limine* to "sanitize" defendant's prior record by referring to defendant's prior convictions as "felonies" only, the trial court bolstered the State's case to the prejudice of defendant. We agree with the State, however, that application of a mere fact method in the instant case where defendant was charged with the unlawful possession of a hypodermic needle could have led to speculation by the jurors that defendant's prior convictions were all drug-related and that such speculation would have been far more damag-

ing than the introduction of defendant's actual convictions of theft and robbery.

Nevertheless, the trial court's refusal to apply the mere fact approach of impeachment was not unjustified. Such an approach is not the rule in Illinois, and, as Justice Steigmann concluded in *Kunze* in his discussion of the approach, adoption of such a rule should emanate from our supreme court. Since no such rule has, thus far, been adopted, the trial court acted appropriately in applying existing State law to deny defendant's pretrial motion to prevent any introduction of defendant's prior record or, in the alternative, to sanitize his prior convictions by referring to them strictly in a general sense as "felonies."

In Illinois, the use of a prior conviction for impeachment purposes is governed by the rule set forth by the supreme court in *People v. Montgomery* (1971), 47 Ill. 2d 510, which provides that evidence of a prior conviction may be introduced for impeachment purposes if it was punishable by imprisonment in excess of one year or involved dishonesty and if either the conviction or release from confinement occurred within the preceding 10 years. (*People v. Powell* (1985), 139 Ill. App. 3d 701, 707.) Once these prerequisites are met, the court must weigh the prejudicial effect of admitting evidence of the prior conviction against its probative value. (*Montgomery*, 47 Ill. 2d at 517.) The court, however, is given wide latitude in exercising its discretion in admitting evidence of a prior conviction for the purpose of impeaching a witness' credibility. *People v. Rixie* (1989), 190 Ill. App. 3d 818, 826.

Here, the record shows that during the hearing on defendant's pretrial motion *in limine* to exclude all mention of defendant's prior convictions, careful consideration was given to allowing just those convictions which occurred within the past 10 years. The court emphatically stated that it could not even consider defendant's convictions which occurred prior to the 10-year period. Additionally, the robbery and theft convictions, which the court permitted the State to use, had been punishable by imprisonment in excess of one year or involved dishonesty. In our view, robbery and theft are veracity-related crimes, and convictions thereof are probative of defendant's credibility. Here, also, the court specifically stated that the crimes went to defendant's credibility.

We conclude that the trial court did not abuse its discretion in admitting evidence of defendant's prior convictions of robbery and theft for purposes of impeachment where such convictions had occurred within the past 10 years and were for crimes punishable by

imprisonment in excess of one year or involving dishonesty and where the court gave the jury a limiting instruction advising the jurors only to consider such evidence as it bears on defendant's credibility. The admission of such evidence did not deny defendant a fair trial.

Additionally, defendant argues that the trial court's refusal to allow the jury to learn that defendant had been acquitted on the charge which caused his arrest denied him a fair trial. Defendant points out that the jury was informed through testimony by Officers Powell and Leon that, prior to the discovery of the hypodermic needle in defendant's possession, defendant had been arrested for an offense which had occurred at an earlier time and date. Defendant posits that this testimony along with information regarding defendant's prior convictions of robbery and theft unnecessarily proved a propensity to commit crime and denied him his right to present a complete defense.

■ We note, first, that we have already determined that evidence of defendant's prior convictions was properly admitted for purposes of impeachment only and, therefore, find it unnecessary to devote any further discussion to the purpose of such evidence.

Evidence of the commission of other crimes is inadmissible where such evidence is relevant to establish a defendant's propensity to commit crime. (*People v. Walker* (1990), 194 Ill. App. 3d 864, 867.) We, however, are in agreement with the State's argument that the evidence at issue was not typical other crimes evidence. As the State points out, the offense for which defendant had been taken to the police station for questioning was never named or described to the jury, nor was there any testimony establishing that defendant had actually committed the unnamed offense. Under these circumstances, it cannot be said that the evidence at issue proved defendant's propensity to commit crime.

Moreover, we fail to see how keeping defendant's acquittal of the unnamed offense from the jury precluded defendant from presenting his theory of defense. Defendant's defense was that the hypodermic needle was planted on him by the police to secure a conviction against him for something in the event that the arrest for the unnamed charge proved unsuccessful. It is defendant's argument that it was difficult, if not impossible, to support his theory of an ulterior motive on the part of the police without being able to inform the jury of his acquittal on the unrelated charge.

Defendant's theory, however, was presented to the jury. During direct examination, defendant implied that the needle was planted

on him by the police. During redirect examination, he testified that he had been accused of another charge and found not guilty. Additionally, during closing argument, as the State points out, defense counsel explained the theory of defense, *i.e.*, that the materialization of the hypodermic needle at the police station bought the police more time to hold defendant while they investigated an unrelated offense.

Accordingly, the trial court's refusal to permit defendant to inform the jury of his acquittal of the offense which formed the basis of his arrest did not deny him the right to present his defense nor allow the State to improperly present other crimes evidence.

Defendant also claims that the trial court's failure to permit him to introduce Officer Powell's report as a prior inconsistent statement, pursuant to section 115—10.1 of the Code of Criminal Procedure of 1963 (Ill. Rev. Stat. 1987, ch. 38, par. 115—10.1), denied him a fair trial. At trial, Officer Powell testified during direct examination as a State witness that during an inventory search at the police station he had found the hypodermic needle in the right pocket of a coat which defendant had had in his possession at PADS. Recalled as a defense witness, Powell reiterated that he had found the hypodermic syringe and needle in a coat defendant had had on his lap at PADS. Powell admitted that his written report, prepared on the morning of the offense in question, made no mention of the article of clothing from which the needle was removed or that defendant even had had a coat. Rather, Powell stated, the report indicated "that the needle was taken from a right pocket from the defendant." Later, defendant sought to admit the police report as substantive evidence of a prior inconsistent statement pursuant to section 115—10.1, but the court deemed it inadmissible.

Prior to the enactment of section 115—10.1, police reports could not be used as substantive evidence. (*People v. Seider* (1981), 98 Ill. App. 3d 175, 191; Ill. Rev. Stat. 1987, ch. 38, par. 115—5(c)(2).) Following passage of section 115—10.1, such reports were admissible substantively if they met the requirements of the statute. The statute provides, in relevant part:

> "In all criminal cases, evidence of a statement made by a witness is not made inadmissible by the hearsay rule if
>
> (a) the statement is inconsistent with his testimony at the hearing or trial, and
>
> (b) the witness is subject to cross-examination concerning the statement, and
>
> (c) the statement—

***

     (2) narrates, describes, or explains an event or condition of which the witness had personal knowledge, and
        (A) the statement is proved to have been written or signed by the witness ***." Ill. Rev. Stat. 1987, ch. 38, par. 115—10.1.

Here, defendant maintains that Powell's report, which failed to mention the article of clothing from which the needle was recovered or whether defendant even had a coat, tended to contradict his in-court testimony that the needle was found in a right coat pocket and was, therefore, inconsistent. Defendant argues that since Powell was subject to cross-examination concerning the report, which by Powell's testimony narrated, described, or explained an event of which he had personal knowledge and was written and signed by him, the trial court erred in refusing to admit the report. The State agrees with defendant that the officer's report was substantively admissible under section 115—10.1 but submits that the error was harmless because the relevant information was placed before the jury.

While testifying as a State witness, Officer Powell related that when he first observed defendant at PADS, defendant was sitting at a table with a three-quarter-length, cloth coat partially draped on his lap. By his recollection, the coat had two pockets. Powell recalled that defendant was watching Powell and the other officers present and that he appeared to be pushing the coat away from himself. Powell explained that after defendant's arrest defendant was taken to the police station where the officer conducted an inventory search of defendant's coat and found the needle in the right coat pocket. When questioned later about his police report, Powell acknowledged that it contained no mention of defendant's coat but just a statement that the needle was recovered from "a right pocket." All of this testimony, as the State points out, was in open court before the jury.

In *People v. Broadnax* (1988), 177 Ill. App. 3d 818, this court found harmless the trial court's error in denying the use of a police officer's report as substantive evidence. There, the report indicated a witness had identified a person other than defendant at a showup as the individual who robbed her. At trial, however, the victim and two other eyewitnesses to the robbery identified defendant as the robber. Moreover, the officer who prepared the report testified that he had transposed defendant's and the other individual's names in his report and that it was defendant whom the victim had identified

at the showup. This court determined that there was little probability that the officer's report would have changed the outcome of the trial if it had been allowed as substantive evidence.

■ Here, there was a discrepancy between Powell's testimony and his report regarding the coat. However, the testimony of both Officer Powell and Officer Leon indicated that the coat was in defendant's possession at PADS, that it was taken to the police station, that an inventory search was conducted at the station, and that the hypodermic syringe and needle were recovered during that search. While Leon, who witnessed the search, was uncertain as to the exact location of the needle, Powell, who conducted the search, testified he found it in defendant's right coat pocket. While a discrepancy existed between Powell's testimony and his report regarding the coat, it does not appear that the substantive admission of the report would have changed the outcome of the trial.

A reviewing court will not reverse a judgment merely because error has been committed unless it is evident that real justice has been denied or that the finding of guilty may have resulted from such error. (*Broadnax*, 177 Ill. App. 3d at 835.) Such results are not evident here, and, therefore, the trial court's error in refusing to admit the report was harmless.

Defendant's second contention is that the jury improperly based its verdict on a comment by the trial judge. Following instructions to the jury, the trial judge told the jury:

> "You're going to go back in the jury room and deliberate. I'm not going to send any of the exhibits back with you. I'm not sure how many there were. I'm not going to send the needle back. Sometimes things get a little unruly and I don't want that needle found in somebody else's arm."

After deliberations, the jury returned a guilty verdict. Defense counsel requested that the jury be polled, and each juror reaffirmed the guilty verdict. Before discharging the jury, the following colloquy occurred:

> "[THE COURT:] Before I let you go, there was a request, I understand, that you wanted to see the hypodermic needle. Do you want to tell me why?
>
> THE FOREPERSON: There was some question in the group that we didn't actually see the needle and the fact that it had a covering over it and we understood that it was not a two part. It was a throw away. But it was just the fact that for some reason if there hadn't actually been a needle on the

syringe. That point was just asked and we just thought we wanted to see it. Which wasn't brought up during the trial.

THE COURT: I don't mind if you want to look at it right now. I don't know as it's going to make any difference one way or another to any of you. But I have no problem letting you see it again.

THE FOREPERSON: The comment was that in fact if the needle portion wasn't in fact there, that there would be then obviously some doubt in our minds. But it was also brought out that your comment in regard to the inference that obviously there was a needle there before we went into the jury room. We simply based our judgment on your comment.

THE COURT: Either one of you have any objection if I show it to them again?

MR. ROGERS: At this point, no.

MS. DIAMOND: I have no objection.

THE COURT: My comment was based on the testimony."

Relying on this exchange, defendant argues the jury's verdict was based on the trial judge's comment as to the existence of the needle rather than on properly admitted evidence. Initially, we note that defense counsel made no objection during the above exchange or at the time the court decided not to send the needle back with the jurors to the jury room. Additionally, counsel failed to raise the instant issue in defendant's post-trial motion, and the failure to raise an issue in a written post-trial motion results in a waiver of that issue on appeal (*People v. Enoch* (1988), 122 Ill. 2d 176, 186).

Defendant argues that the issue in question, although not included in his post-trial motion, is reviewable under the plain error doctrine (134 Ill. 2d R. 615) because a substantial right is affected, *i.e.*, defendant's due process right to be tried only by competent evidence duly admitted at trial. In light of the plain error doctrine, we choose to review the instant issue.

Subsequent to the foreperson's remark that the jury based its judgment that a needle was on the syringe on the comment made by the court prior to the jurors' retiring to the jury room, the court stated, "My comment was based on the testimony." Clearly, it was.

During his testimony, Officer Powell described the needle and syringe and explained how he sealed and marked it after he discovered it. Additionally, he identified the needle and syringe in open court.

"Q. [Assistant State's Attorney] Okay. Would you open that envelope, Officer, and examine the contents of it, please?

A. The envelope contains one syringe that I have tagged on the inside also with one of our Aurora Police Department evidence stickers.

Q. Okay. Is there a—there is a needle attached to that?

A. That's correct.

Q. Okay. Is that syringe and needle in substantially the same condition as the first time you saw it?

A. Yes, it is.

Q. Okay. And how is it that you recognize that particular syringe and needle?

A. I placed one of our evidence tags, I wrapped it around the needle so it wouldn't fall off, with my name and offense number.

Q. That would be the only difference in the needle from when you first obtained it until today?

A. That's correct."

Shortly thereafter, the court admitted the needle and syringe into evidence. The prosecutor asked to publish the exhibit to the jury but expressed concern regarding passing it around. The court commented that it had no problem with passing around the exhibit but stated that, if defense counsel had no objections, it did not want the needle and syringe to go to the jury room with the jurors. Defense counsel stated he had no objection to the court's decision but added that he also would like an opportunity to look at the needle and syringe. The record is unclear whether the syringe and needle were passed around the jurors or whether defense counsel examined the exhibit. Nevertheless, questions subsequently posed by counsel to Officer Powell during cross-examination established that both a needle and syringe were recovered from defendant.

"Q. [Defense counsel] This hypodermic syringe and needle that you found, that is designed to go under the skin, correct, into a person's bloodstream and inject something?

A. That's right.

* * *

Q. *** [D]id you submit the needle to the crime lab or ask anybody at the crime lab to look at the needle or the syringe to determine whether there might be traces of fiber, blood, hair, skin, anything like that?

A. No, I didn't."

Additionally, Officer Leon testified that he was present when Officer Powell conducted an inventory search and found the hypodermic needle.

It is well established that any extraneous or unauthorized information reaching the jury is prejudicial error. (*People v. Holmes* (1978), 69 Ill. 2d 507, 517.) Here, however, where the information of which defendant complains was no different from that provided through competent evidence admitted at trial, we cannot say that the exchange between the court and the foreperson impeached the jury's verdict.

Next, defendant contends that the AIDS-testing statute, section 5—5—3(h) of the Unified Code of Corrections (Ill. Rev. Stat. 1989, ch. 38, par. 1005—5—3(h)), is unconstitutional because the testing infringes upon his right to privacy in his body and his right to be free from unreasonable searches and seizures. Section 5—5—3(h) provides that any defendant convicted of the unlawful possession of a hypodermic needle or syringe must undergo medical testing to determine whether he has been exposed to human immunodeficiency virus (HIV) or any other identified causative agent of acquired immunodeficiency syndrome (AIDS).

Defendant maintains that AIDS testing violates a reasonable expectation of privacy he has in the integrity of his body and his interests in independently making fundamentally important medical decisions. Defendant acknowledges that the State can promote public health and that the purpose of AIDS testing is to promote public health, but argues that section 5—5—3(h) is a "pathetic attempt to do so." According to defendant, the statute provides for no particularized showing of a need for testing but, rather, orders testing solely upon the conviction of possession of a hypodermic syringe and that such automatic testing following a conviction is "more akin to a police dragnet than a scheme carefully tailored to reduce any possible infringement of protected rights." Defendant points out that the only evidence presented to the court ordering the blood test that he may have been infectious was his conviction of unlawful possession of a hypodermic needle and syringe. No showing was made or attempted that he had used the device that he was convicted of possessing, that he customarily used such devices, or that he was addicted to drugs which are customarily injected. Further, defendant asserts, even if it could be assumed that defendant was infectious, no showing was made that defendant presented a real and present danger to the public health or that less coercive alter-

natives to the testing existed (Ill. Rev. Stat. 1987, ch. 111½, par. 7406(c)).

Additionally, defendant maintains that testing him for the presence of AIDS constituted an unreasonable search and seizure which violated his constitutional rights. Blood testing, defendant asserts, implicates defendant's "most personal and deep-rooted expectations of privacy" (*Winston v. Lee* (1985), 470 U.S. 753, 760, 84 L. Ed. 2d 662, 668, 105 S. Ct. 1611, 1616), and these expectations must be balanced against the governmental interests in maintaining the public health to justify the intrusion. According to defendant, the intrusion here was not justified because no probable cause existed to believe that he was infected with AIDS, that the hypodermic device recovered was infected, or that he had used the device or a similar device. Also, the blood testing was not justified by "special needs" beyond the promotion of public health which rendered the probable cause requirement impractical such as in *Skinner v. Railway Labor Executives' Association* (1989), 489 U.S. 602, 103 L. Ed. 2d 639, 109 S. Ct. 1402 (railway employees in "safety sensitive" positions, who discharged duties fraught with risk of injury to others, were subject to blood and urine testing after certain events), or *National Treasury Employees Union v. Von Raab* (1989), 489 U.S. 656, 103 L. Ed. 2d 685, 109 S. Ct. 1384 (employees applying for sensitive positions in the Customs Service, charged with the duty of safeguarding the public interests, were subject to mandatory drug testing).

In response to defendant's contentions, the State argues that section 5—5—3(h) represents a reasonable exercise of the State's police powers and a well-reasoned response to the accelerating epidemic of HIV infection among intravenous (IV) drug users. Citing Flanders & Flanders' *AIDS Library in a Book* (1991), the State emphasizes that HIV transmission is increasing among IV drug users who commonly share unsterile needles and that this risk group will be hardest hit by AIDS in the 1990s. The State acknowledges the defendant's privacy interests in his own bodily integrity and that any governmental infringement of such privacy is only tolerated when the State's interests meet an acceptable and narrow purpose. But, here, the State asserts, defendant's conviction of criminalized behavior, which has been identified as high risk behavior for the spread of AIDS, gives the State the right to intrude minimally upon the "inviolability of his person" by requiring him to undergo HIV testing.

The State disagrees with defendant's contention that section 5—5—3(h) does not promote public health, pointing out that the State

may compel defendant to accept information regarding the dangers of the transmission of AIDS and also compel defendant to provide public health officials with information regarding the extent of the spread of the disease by means of the minimally intrusive blood test. Additionally, the State disagrees with defendant's contention that the statute does not provide for a particularized need, arguing that defendant's conviction of the illegal possession of a hypodermic needle and syringe constitutes a particularized need because it demonstrates activity which is known to spread the disease. Further, the State contends that defendant's analogy to a "police dragnet" is totally misplaced, as defendant will not suffer any additional prosecution because he may be infected with HIV.

The State concludes that defendant's privacy concern carries less weight than the State's concern in slowing the spread of AIDS and that, therefore, HIV testing ordered pursuant to section 5—5—3(h) is reasonable under the fourth amendment to the United States Constitution (U.S. Const., amend. IV).

■■ We have very recently considered, in *People v. C.S.* (1991), 222 Ill. App. 3d 348,[1] arguments identical to those raised by the parties here. In *C.S.*, after careful consideration of these same arguments, we upheld the constitutionality of the HIV-test mandate of section 5—5—3(h), finding that the State's interest in controlling the spread of AIDS is based on an acceptable and narrow purpose, that of protecting the public health, and that the HIV-testing requirement of section 5—5—3(h) directly addresses that interest. In so finding, we pointed out that the statute's testing mandate required "mere submission to a minimally intrusive medical technique involving virtually no risk, trauma, or pain," that the mandate is "limited to persons convicted of criminality connected with high-risk behavior for the transmission of a deadly disease," *i.e.*, the unlawful possession of items closely connected with illegal intravenous drug use, and that the statute "specifically provides for confidentiality of test results." (*C.S.*, 222 Ill. App. 3d at 354.) In light of these circumstances, we concluded that the mandatory blood testing set forth in section 5—5—3(h) complies with the fourth amendment's standards for reasonableness.

As both *C.S.* and the instant case involved convictions of the unlawful possession of a hypodermic device and as the defendant in

---

[1]*People v. C.S.* was withdrawn by a different panel of this court upon the granting of a petition for rehearing on November 8, 1991.

the instant case has presented this court with no new challenges to the constitutionality of the AIDS-testing statute but, instead, with challenges identical to those raised in *C.S.*, we find no basis for disturbing the findings and conclusions reached there. Accordingly, we affirm our holding in *C.S.* that the HIV-test mandate of section 5—5—3(h) meets the reasonableness standards of the fourth amendment and is constitutional.

Last, defendant contends that the trial court erred in finding him in contempt for failing to submit to testing for AIDS. It is defendant's position that he cannot be held in contempt for failing to submit to a blood test which the State failed to conduct within the time frame specified in the court's order.

The State argues that defendant's challenge to his contempt finding is moot because defendant complied with the testing order on April 12, 1991. The State points out in its brief that it learned of defendant's compliance through a conversation the appellate prosecutor's office had with the assistant State's Attorney who tried the contempt hearing. However, absent a stipulation between the parties, matters outside the record cannot be considered by this court of review. (*People v. Gholston* (1984), 124 Ill. App. 3d 873, 897.) Here, there was neither a stipulation between the parties nor a request by the appellate prosecutor to this court seeking permission to supplement the record with evidence of defendant's compliance. Consequently, the facts and argument in the State's brief pertaining to defendant's compliance are *dehors* the record and will not be considered by this court.

On June 28, 1989, the trial court ordered defendant, pursuant to section 5—5—3(h) of the Unified Code of Corrections (Ill. Rev. Stat. 1987, ch. 38, par. 1005—5—3(h)), to undergo blood testing for AIDS "not later than 7—5—89." Defendant maintains that because he was not taken to the jail's nursing facilities for the blood test until July 11, 1989, he cannot be held in civil contempt for failing to submit to testing procedures at that time.

In a civil contempt proceeding, the burden of proving that the defendant is in contempt is on the party bringing the action, and the defendant must be proven guilty of the accusation by at least a preponderance of the evidence. (*Wayne Township Board of Auditors v. Ludwig* (1987), 154 Ill. App. 3d 899, 908.) The party charged bears the burden of establishing his inability to comply with the court's order and to show why he should not be held in contempt. (*Central Production Credit Association v. Kruse* (1987), 156 Ill. App. 3d 526, 532.) Moreover, civil contempt must be wilful, and the

burden of proof is on the contemnor to negate this element. 156 Ill. App. 3d at 532.

■ Contrary to defendant's position here, the evidence presented at the contempt proceeding supported the contempt finding. Nurse Doris Esgeny, who was to perform the blood test, and Officer Wayne Bartlett, who escorted defendant to the county jail's nursing facilities and was present for the test, testified on the State's behalf. Esgeny stated that she explained to defendant that she had a court order to obtain a blood sample and that his response was, "No." Esgeny asked if defendant wanted to see a copy of the order, and he again simply responded, "No." Esgeny recounted that she had no other conversation with the defendant.

Officer Bartlett's testimony was substantially similar to Esgeny's. According to the officer, defendant refused to submit to a blood test and declined to look at the court order. The officer then returned defendant to his cell. The testimony of both Bartlett and Esgeny reflects that defendant provided no reasons for his refusal to submit to the blood test.

Defendant also testified at the contempt proceeding, admitting that he declined to submit to the blood test. When asked by defense counsel what his reasons were for declining the test, defendant replied:

> "A. Because I felt in light of being guilty, I felt unjustly, I felt that it would be unconstitutional for me to submit to a test of that nature. Then with respect to the circumstances that arose out of that guilty verdict.
>
> Q. Are there any other reasons?
>
> A. I just don't want nobody extracting bodily fluids from my body against my will. That's all."

It is clear from this testimony that defendant's refusal to submit to the blood test was not based on the fact that the test had not been scheduled prior to "'7-5-89" as set forth in the court's order but on other reasons.

Defendant attempts to negate his willfulness not to comply with the order by stating that "[t]he record is barren of any evidence showing that Thomas would have refused to submit to the test had the authorities promptly complied with the order." Given defendant's reasons, however, for refusing to take the blood test, we find it unlikely that he would have willingly submitted to the test had it been scheduled earlier.

Moreover, there may have existed legitimate reasons for the delay in scheduling defendant for the test, but those reasons, if any,

are not part of the record. As the State's failure to comply timely with the court's order was not raised in the contempt proceeding, the State had no opportunity to offer reasons for that failure. Generally, the theory upon which a case is tried cannot be changed on review (*Tomaso v. Plum Grove Bank* (1985), 130 Ill. App. 3d 18, 25), and this court should not consider different theories or new questions if proof might have been offered to refute or overcome them had they been presented at trial. (*Klubeck v. Division Medical X-Ray, Inc.* (1982), 108 Ill. App. 3d 630, 636.) As the theory espoused in this court for defendant's refusal to take the blood test is different from the theory presented at the contempt proceeding, we shall not consider it.

Based on the evidence and theory which were presented to the trial court, we conclude that defendant did willfully refuse to comply with the court's testing order. Accordingly, the court did not err in finding defendant in civil contempt for failing to submit to the blood test.

The judgment of the circuit court of Kane County is affirmed.

Affirmed.

INGLIS and NICKELS, JJ., concur.