U.S. MINERALS AND MINING, INC., Plaintiff and Counterdefendant-Appellee, v. LICENSED PROCESSORS, LTD., Defendant and Counterplaintiff-Appellant (Frank Chenoweth *et al.*, Counterdefendants).

Fifth District   No. 5—88—0285

Opinion filed February 7, 1990.

T. Richard Mager, of Carbondale, and Donald G. Mulack, of Keck, Mahin & Cate, of Chicago, for appellant.

Don E. Prosser, of Gilbert, Kimmel, Huffman & Prosser, Ltd., of Carbondale, for appellee.

JUSTICE WELCH delivered the opinion of the court:

The defendant and counterplaintiff, Licensed Processors, Ltd. (LPL), appeals from the judgment order entered January 4, 1988, and the post-trial order entered April 18, 1988, by the circuit court of Williamson County, Illinois. The judgment rescinded LPL's contract with the plaintiff and counterdefendant, U.S. Minerals & Mining, Inc. (USM), as requested by USM, but granted neither party status quo *ante* damages. In a cover letter to both parties enclosing the post-trial orders of April 18, 1988, denying LPL's motion for modification of the judgment to grant it status quo *ante* damages, the court clarified that while restoration to the status quo is generally the rule following rescission, if both parties have received benefits from the contract

prior to its termination, the court will only award damages if it finds unjust enrichment, and none had been shown in this case.

LPL also appeals from a post-trial order entered the same day which denied its petition for attorney fees and costs under section 2—611 of the Illinois Code of Civil Procedure (Ill. Rev. Stat. 1987, ch. 110, par. 2—611), wherein the court specifically found that there had not been a sufficient showing of bad faith to sustain LPL's section 2—611 request. We note that the appellant has submitted for our review only a partial report of proceedings and none of the trial exhibits, except as they might also have appeared as exhibits in the common law record.

On appeal LPL raises the following issues:

(1) whether the trial court erred in failing to award damages to LPL when it rescinded the contract between LPL and USM; and

(2) whether denial of LPL's section 2—611 petition for attorney fees and costs was against the manifest weight of the evidence and contrary to law.

USM owned the leasehold interest in certain coal mining property known as the Burning Star 1 Mine. USM removed and sold coal from the property during 1983 and 1984. In the spring of 1984 USM discovered that a certain amount of refuse carbon which had accumulated in slurry ponds could not be recovered by normal methods. USM contacted Gary Spiller of LPL with regard to its ability to clean and process this waste carbon so that it too could be sold. In August 1984, the parties entered into an agreement concerning the recovery and processing of the waste carbon. Relevant portions of the August 14, 1984 agreement provided that LPL would build and own the recovery plant and its equipment, which would be built on USM's leasehold. The contract further provided that USM would acquire and own the dredge and pipeline which would carry the waste carbon to LPL's plant for processing. The carbon, once cleaned and dried, would be carried off for sale by USM. LPL would receive compensation from USM of $3.32 per ton plus a premium of 20% of every ton sold at a price in excess of $10.90 per ton. These payments were to be made by USM out of the sale proceeds of each recovered coal shipment.

The contract also recited the assumption of the parties that LPL was an expert in the construction and operation of this type of coal-refuse processing plant. Although the contract specified that LPL would segregate coal according to size, and process "clean" coal, it did not specify the size of the finished product, the specific quality, i.e., minimum B.T.U. requirement, the amount required to be processed, or the minimum volume of slurry to be introduced, other than

to say a "fixed rate of flow." Archie Henderson, who was president of LPL as well as an attorney-at-law, drafted the agreement. The court, finding the contract ambiguous, considered parol evidence in defining some of the parties' obligations under the contract. As far as the size of the coal to be processed, the court found it to be +28 mesh and that "clean coal" meant carbon with a B.T.U. rating of 10,400 or more, based on the contract price of $10.90 per ton. The court further found that both parties relied on a projected slurry feed of 250 to 260 tons per hour for LPL to produce 200 tons per hour of processed coal.

LPL borrowed $300,000 in connection with the purchase and construction of the plant, the total cost of which was $371,000. This loan was secured by LPL's stock.

Processing of the carbon refuse began in December 1984, upon completion of the plant construction. From the beginning the operation was plagued with problems. The dredge and pumping operation was beset with equipment failure, inconsistent slurry composition (the contract required a mixture of between 22% to 35% solids), and down time for cleaning, repairing, and moving equipment at the recovery site. Because USM was unable to deliver a constant rate of slurry flow for the LPL plant to process, the projected production of 200 tons per hour was never realized. Over the 13 months of operation, the average production was only 50 tons per hour. The court did not fault USM for not supplying the constant flow or particular consistency of slurry mixture to LPL's plant, charging instead that LPL, as the expert, should have foreseen the dredge and pumping problems and that the delivery requirements were unrealistic.

The parties held numerous discussions and attempted to remedy some of the problems over the next 13 months. However, on October 30, 1985, LPL shut down the processing plant. On November 4, 1985, USM filed suit against LPL claiming damages or rescission of the contract based on fraud, misrepresentation, or breach of contract. LPL reopened the plant shortly thereafter, and the parties continued to negotiate the contract problems.

In February 1986, LPL again shut down the operation. On the 18th of that month, LPL received notice from USM to remove the plant from its property. LPL did remove the plant in April 1986, but only after USM had disconnected the feed pipe from the dredge and built another processing plant nearby. LPL moved the plant to West Virginia, where it was used by a corporation partly owned by LPL's president. LPL did not receive any compensation for the use of the plant by the West Virginia company. LPL defaulted on its loan pay-

ments in January 1987, and in order to avoid foreclosure sale of its security, LPL sold the plant and paid the loan in full.

The trial of this matter lasted 13 days, and in the course thereof, the court heard testimony of 17 witnesses and admitted 67 exhibits into evidence. Prior to the end of the defendant's case, the court directed a verdict for the defendant on the fraud counts of the plaintiff's complaint. However, the court allowed an amendment of USM's complaint in which it sought rescission of the contract based on mutual mistake. On that amended count the court ordered rescission of the contract but found that as both parties had benefitted during the contract term, no restoration of the status quo for LPL was required. The court further found that USM would not be unjustly enriched by rescission and that the status quo had effectively been reached on February 16, 1986, when production ceased. The court further found for LPL on one count of its counterclaim and entered judgment against USM in the amount of $3,290, representing unpaid premiums due LPL under the contract.

■ LPL contends that the court committed an error of law when it determined that the *"status quo ante"* date was February 17, 1986, rather than August 14, 1984. Generally, persons demanding rescission must restore the other party to the status quo existing at the time the contract was made. (*Hakala v. Illinois Dodge City Corp.* (1978), 64 Ill. App. 3d 114, 120, 380 N.E.2d 1177, 1181.) Restoration of the status quo in contract rescission cases initially requires return of any property or other consideration that is passed to the rescinding party under the contract and also generally requires the rescinding party to account for any benefits received from the other party under the contract. (*Puskar v. Hughes* (1989), 179 Ill. App. 3d 522, 528, 533 N.E.2d 962, 967.) Where costs claimed do not represent any benefit conferred on the rescinding party by the party against whom rescission is sought, they are properly disallowed as restitution. (See *Puskar*, 179 Ill. App. 3d at 530, 533 N.E.2d at 967 (costs of returning equipment to seller's business location and electrifying it did not benefit the purchasers); see also *Cummings v. Dusenbury* (1984), 129 Ill. App. 3d 338, 346, 472 N.E.2d 575, 581 (reimbursement of broker's commission paid by seller did not benefit buyer).) The court below found no credible evidence in the record to support LPL's claim for losses in removal of the plant to West Virginia. We further believe that whatever costs might have been incurred in moving the plant did not benefit USM and were therefore not to be considered in the calculation of restitution for LPL.

LPL argues that it has suffered a loss as a net result of its in-

volvement in the contract with USM over and above the losses incurred at the conclusion of the contract. LPL computed this loss as follows:

> "$371,000 — Cost of plant and setup
> $ 37,389 — Interest on loan
> $408,389 — Total costs
> Less: $245,346 — Profit from operations
> $163,023 [*sic*] — Total loss from contract"

With regard to this loss, which LPL argues the trial court should have awarded as restitution, we believe the issue to be one of fact and not law. The factual determinations of the trial judge will be overturned only if they are contrary to the manifest weight of the evidence. (*Cosmopolitan National Bank v. County of Cook* (1984), 103 Ill. 2d 302, 318, 469 N.E.2d 183, 191.) The trial judge heard 13 days of testimony and had 67 exhibits for consideration of each party's income and expenses under the August 14, 1984, agreement. The appellant has the duty to present the reviewing court with a complete record on appeal; any doubts arising from the incomplete record are therefore resolved against the appellant, and those issues which depend for resolution upon facts not in the record mandate affirmance. *Daniels v. City of Venice* (1987), 162 Ill. App. 3d 788, 791, 516 N.E.2d 701, 703.

On the basis of the record we have before us to review, we also find that as of February 16, 1986, LPL had a net benefit in consequence of the parties' agreement. LPL owned a physical plant for which it paid $371,000 and, according to LPL in its brief on appeal, had net operational profits of over $245,000 during 1985 alone. Balanced against these assets, LPL had liabilities of the $300,000 bank loan and the $100,000 loan from LPL's president. The $37,389 in interest claimed as an expense would have been incorporated in the net operational profit figure. We further find that over the 14-month period LPL had received over $670,000 in processing fees from USM. In order to restore the parties to the status quo, plaintiffs are entitled only to be reimbursed the amount they paid on their contract minus any benefits they received. (*Cotter v. Parrish* (1988), 166 Ill. App. 3d 836, 842, 520 N.E.2d 1172, 1176.) The court's finding that both parties benefitted from the contract was not against the manifest weight of the evidence.

The date at which the court necessarily must assess whether investment outweighed benefits is when the contract operations terminated between the parties on February 17, 1986. We therefore find

that the court did not err as a matter of law when it found that the status quo was effectively reached on February 17, 1986.

■■ LPL also claims as error that the court allowed USM to profit at its expense when it granted rescission of the parties' contract. The trial judge explained his reasoning in not awarding LPL any damages in the post-trial order cover letter to the parties' attorneys dated April 18, 1988. The judge said, "where as in our case, both parties have received benefits from the contract prior to its termination, damages should only be awarded if there is a showing of unjust enrichment." As LPL's attorney admitted in oral argument before this court, there would be no unjust enrichment for USM if it had gain but LPL had no loss under this contract. Because we have already upheld the trial court's factual finding that LPL benefitted from this contract, whatever profits USM may have also enjoyed do not constitute unjust enrichment, unless there was some showing that the profit resulted from unlawful or improper conduct, as defined by law. (*Charles Hester Enterprises, Inc. v. Illinois Founders Insurance Co.* (1985), 137 Ill. App. 3d 84, 90, 484 N.E.2d 349, 354.) While the court below found that USM owed LPL $3,290 in unpaid premiums and awarded LPL that amount on its counterclaim, there is nothing in the record before us to indicate that the remainder of USM's profits were unjustly or unlawfully obtained.

■■ Finally, LPL argues that denial of its section 2—611 petition for attorney fees was against the manifest weight of the evidence and that as a matter of law the court erred in imposing a "bad faith" standard for the conduct of the respondent in the section 2—611 petition. In its order the court recited that its denial of the petition was made after a review of the authority and argument presented by counsel, and it further specifically found that there had not been a sufficient showing of bad faith. LPL apparently concludes from this statement that the court required a showing of "bad faith" on USM's part before it would award LPL its attorney fees. Section 2—611 of the Illinois Code of Civil Procedure in effect when suit was filed in 1985 provided as follows:

> "Allegations and denials made without reasonable cause and found to be untrue shall subject the party pleading them to the payment of reasonable expenses, actually incurred by the other party by reason of the untrue pleading, together with a reasonable attorney's fee, to be summarily taxed by the court upon motion made within thirty days of the judgment or dismissal." Ill. Rev. Stat. 1985, ch. 110, par. 2—611.

■■ It was LPL's burden to demonstrate to the satisfaction of the

court that USM abused its right to free access to the courts by pleading untrue statements of fact which the pleader knew or reasonably should have known were untrue. (*St. Paul Federal Savings & Loan Association v. Avant* (1985), 135 Ill. App. 3d 568, 578, 481 N.E.2d 1050, 1057.) A lower court's decision regarding the assessment of attorney fees is entitled to great weight and should not be disturbed unless there has been an abuse of discretion. *Prevendar v. Thonn* (1988), 166 Ill. App. 3d 30, 40, 518 N.E.2d 1374, 1381.

■ Again we must reiterate that the trial court had the benefit of the entire trial testimony and all exhibits before it when it denied LPL's petition. We cannot say based upon the portion of the record before us that the judge's decision was against the manifest weight of the evidence. That the court directed a verdict for the defendant on the fraud and misrepresentation counts of the complaint is far from dispositive of any conclusion that USM had no reasonable cause to make those allegations in November 1985 when it filed this suit.

LPL relies on what it terms the "admissions" on cross-examination of John Smothers, one of USM's officers, that there was no fraud. We have reviewed the transcript of Smothers' cross-examination and find it less than conclusive that Smothers did not believe at the time he verified the complaint that USM had been defrauded. Moreover, not having the benefit of Smothers' direct or redirect testimony, we are in no position to categorize the cross-examination testimony as an admission. A party may, by his own testimony, conclusively bar his claim or defense, but a determination that he has done so depends upon an evaluation of all his testimony, and not just a part of it. (*McCormack v. Haan* (1960), 20 Ill. 2d 75, 78, 169 N.E.2d 239, 241.) We also disagree with LPL's characterization that there was a complete failure of any proof that it committed any misrepresentation, fraud or deception. We believe that this case is dissimilar to the *Brandenberry* or *Ready* cases relied upon by LPL. In *Brandenberry*, the plaintiff introduced no evidence to support the allegations of its complaint. (*Brandenberry Park East Apartments v. Zale* (1978), 63 Ill. App. 3d 253, 263, 379 N.E.2d 674, 681.) In *Ready*, most of the allegations made in the complaint were found to be untrue. *Ready v. Ready* (1962), 33 Ill. App. 2d 145, 161, 178 N.E.2d 650, 658.

■ ■ With regard to the lower court's imposition of a "bad faith" standard on section 2—611, we believe that a finding that USM did not act in bad faith would be a material consideration in determining that the pleader made the allegations of its complaint with reasonable cause. Although lack of good faith no longer need be shown, the facts, circumstances, motive, intent or purpose of the pleader are ma-

terial in determining whether the allegations were made with reasonable cause. (*Wollschlager v. Sundstrand Corp.* (1986), 143 Ill. App. 3d 347, 352, 493 N.E.2d 107, 111.) The elimination of the requirement of proof of bad faith as an independent element to be proved does not, of course, completely eliminate this factor. (*In re Estate of Knutson* (1980), 83 Ill. App. 3d 907, 912, 404 N.E.2d 1003, 1006.) Just such a finding was recently made by us in the *Dunaway v. Ashland Oil, Inc.* case wherein we reiterated this element's relevance to reasonable cause for making the allegations of the complaint. (*Dunaway v. Ashland Oil, Inc.* (1989), 189 Ill. App. 3d 106, 118, 544 N.E.2d 1313, 1322.) In short, we do not believe that the denial of LPL's section 2—611 petition was an abuse of discretion, based on the evidence, or that it was determined by way of an improper legal analysis.

For the foregoing reasons the judgment of the circuit court of Williamson County is affirmed.

Affirmed.

HARRISON, and GOLDENHERSH, JJ., concur.