SECOND DIVISION

March 23, 1999

    

No. 1-97-1563

THE PEOPLE OF THE STATE OF ILLINOIS,

Plaintiff-Appellee,

v.

EDGAR ROSS,

Defendant-Appellant.

)

)

)

)

)

)

)

)

)

Appeal from the

Circuit Court of

Cook County

Honorable

John E. Morrissey,

Judge Presiding.

PRESIDING JUSTICE GORDON DELIVERED THE OPINION OF THE COURT:

After a jury trial in January 1997 defendant Edgar Ross was found guilty of the first degree murder (720 ILCS 5/9-1-A(1), 5/9-1-A(2) (West 1994)) of Henry Johnson.  The court entered judgment on the verdict and sentenced defendant to 43 years imprisonment in the Illinois Department of Corrections (IDOC).  Defendant contends he was denied a fair trial and received an excessive sentence.  We reverse and remand.

At trial Ian Williams testified for the State that on the evening of December 22, 1994, he and his friend Henry Johnson went to the home of Johnson's girlfriend, Leslie Owens (Owens), on 106th Place in Chicago.  The two brought alcoholic beverages and consumed some of them en route.  When they arrived, they saw defendant on the street in front of Owens's house.

Williams went inside the house after speaking with defendant briefly, but Johnson stayed outside and shared his drink with the defendant.  Inside the house with Williams were Owens and Owens's friend Melissa Page.  After approximately 15 minutes, Owens looked outside and told Williams that Johnson was going to help the defendant fight someone.  She told Williams to "come get your boy" before the fight started.  Williams went to the door and called Johnson to come inside, which he did.  Some time thereafter another woman named Neecie Roberts arrived.  Williams and Johnson drank as the group talked.  

Some time later, defendant knocked on Owens's door and she let him in.  When he came in, the defendant began talking loudly about "what just happened outside with him"; his voice woke Owens's mother (Big Leslie), who asked to join the party and became angry because people were drinking and had not offered her anything to drink.  Defendant passed his hat around to collect money to buy Big Leslie a drink.  Williams testified that he gave defendant a dollar, but when defendant got to Johnson, Johnson said to him "on the five you trying to get some for yourself."  Williams stated that he had never heard the term "on the five" before that night, but he explained that the phrase meant "It's like on everything we know and love, you know, on the five."  He stated that Johnson was not and never had been in a gang.  

Williams stated that defendant responded "F--k the five," and grabbed Johnson by the neck.  The two began fighting, and Williams stated that it took a while to separate them because they were both large men (he stated that Johnson was 6'3" and 200 pounds and defendant was 5'9" and 180 pounds).  After they were separated, Big Leslie ordered everyone out of the house.  Defendant left immediately and Williams and Johnson left together a short time later after they had gathered their things together.

As Williams and Johnson were walking home, Williams saw the defendant "running out of somebody's house" towards them.  Defendant confronted them and began asking "what's up," and took off his belt in a threatening manner.  Williams stepped between defendant and Johnson to prevent them from fighting, but Johnson took off his coat as if preparing to fight, and defendant swung around Williams and hit Johnson in his chest with the belt.  Williams stepped out from between the two and Johnson struck defendant in the face, after which defendant ran back to the house he had just come from.  Williams and Johnson gathered their things and began walking away more quickly.

A few minutes later, defendant ran up behind Williams and Johnson with a rifle in his hands.  Williams and Johnson ran in separate directions.  Williams ran into a gangway but found his way blocked by a gate barring the far end.  When he returned to the mouth of the gangway, he saw defendant fire the rifle at Johnson twice, then run.  He stated that he was 10 to 15 feet away from the defendant, there was nothing obstructing his view, and the area was fairly well lit by streetlights.

When Williams emerged from the gangway he saw Johnson lying on the ground face down about three houses away.  When he ran over to Johnson and turned him over, Johnson was covered with blood and had stopped breathing.  The police arrived within approximately 5 minutes.  Williams testified that at the police station later that night (or early the next morning) he selected the defendant's photo out of an array.  He also picked the defendant out of a line-up on August 3, 1995.

Neecie Roberts corroborated Williams's version of the fight at Owens's house, except that she stated that Johnson and defendant were both stating "gang slurs" like "f--k the five" and "f--k the Chief" before defendant attacked Johnson and began to choke him.  She stated that Melissa Page left the house shortly after the three men but returned almost immediately and stated that defendant, Williams and Johnson were fighting.  However, when Roberts went outside with Owens and Page she only saw Johnson putting on his jacket.  She heard Johnson yell "Vice Lord Killer," which she understood to be a gang slogan.

Roberts stated that the women returned inside, but a few minutes later she heard two gunshots.  When she went outside she saw Johnson lying on the street, but she did not see the shooting and never saw the defendant with a gun.

Melissa Page corroborated that Johnson and Williams had come over to Owens's house on December 23 and that defendant and Johnson got into a fight at Owens's house when defendant asked Johnson for money.  Page stated that Johnson was saying "gang stuff" like "f--k the five, f--k the chiefs," to which defendant responded "okay, f--k the five, f--k the chiefs."  Page explained that Johnson and defendant were both members of gangs which were part of a general gang organization known as the "Brothers," or "People," whose symbol was the number 5 (as distinguished from the organization known as the "Folks," whose symbol was the number 6).  She stated that the exchange between Johnson and defendant meant that they were going to fight each other despite the fact that they "were both under the same number," 
i.e., 
had similar gang ties.

Page stated that when she left Owens's house she saw Johnson picking his shirt up off the ground and saw defendant running across the street and into a gangway.  Johnson was yelling after him "go run get the strap, go run like a little baby."  Page stated that she understood a "strap" to mean a gun.  She went back inside and told the others that it seemed like the men had been fighting.  Page heard two gunshots while she was back inside the house and when she went back outside after the police arrived she saw Johnson dead on the ground.

Chicago Police Officer Daniel Aguilera testified that he and his partner responded to a radio call reporting a man shot at 334 West 106th Place.  They responded to the call and saw a man lying on the ground on his back and another man over him calling for help, telling them his friend had been shot.  Aguilera called for an ambulance on the radio and taped off the area around the body to preserve the scene.  He spoke with Williams and Owens and subsequently sent out a "flash message" over the radio to alert other units to look for defendant Edgar Ross in connection with the shooting.  He and his partner then went to the defendant's house (about half a block from the scene of the shooting) with the detectives who had by that time arrived on the scene.

Chicago Police Detective Herman Cross testified that he responded to the scene of the shooting on the evening of December 23.  He immediately had Williams transported to the Area 2 Violent Crimes Police Station for an interview.  He subsequently went to Owens's home and spoke with Roberts, Page, and Owens at Owens's home.  He also had those three witnesses brought to Area 2 and spoke with them again there.  As a result of those conversations, he looked for the defendant in connection with the shooting.  Detective Cross stated that he went to defendant's home address (across the street from Owens's home) three times on December 23, but never found defendant at home.  He told a woman with whom he spoke at that house that it would be in defendant's best interest to surrender in order that the police could determine what had happened.  In January 1995, approximately a month later, still having failed to locate the defendant, Detective Cross obtained a warrant for his arrest.

Several months later, in August 1995, Detective Cross was notified by the authorities in Milwaukee, Wisconsin, that the defendant was in custody at the Milwaukee County Jail.  Detective Cross and a Detective Bernatek went to Milwaukee and brought the defendant back to Chicago.  After a line-up in Chicago in which Williams identified the defendant as the perpetrator, he was charged with first-degree murder.

On cross-examination Detective Cross stated that when he interviewed Williams, Williams told him that during the incident at Owens's house Johnson and defendant "began to exchang[e] gang slogans such as on the five and f--k the five."  He also stated that when he took defendant into custody in Milwaukee he read him his Miranda rights.  When defense counsel asked Cross if he thereafter had a conversation with the defendant, Cross replied that the defendant "told us he had a lawyer, and he didn't have anything to say."  The court immediately interrupted, instructed the detective simply to answer the question yes or no and admonished the jury to disregard the answer.  

At the termination of Detective Cross's testimony defendant moved for a mistrial based on the detective's testimony regarding defendant's invocation of his right to remain silent.  The defense contended that the comment not only would have been improper if true, but in fact was not accurate, because the defendant did not refuse to answer questions, but rather voluntarily cooperated with extradition and subsequently waived his rights and gave a statement in which he admitted having an argument with Johnson but stated that he left the area thereafter.  The court denied the motion, stating that the improper comment was cured by the "prompt cautionary instruction to the jury to immediately disregard Detective Cross's remark."  The court also denied the defense request to call Detective Cross during its case in chief and impeach him by introducing the full text of the defendant's subsequent statement.

The defendant testified on his own behalf.  He stated that at the time of the crime he was not living at the 106th Place address but rather on 113th Street.  Before going to Owens's house that evening he went to visit a friend, Suzette, who lived on the same block as Owens.  After leaving Suzette, he was on his way to Owens's house when he ran into Johnson and a friend whom defendant knew by the name of "Little Snake."  He stated that Williams was not present at the time, and he and Johnson and "Little Snake" spoke for 35 to 40 minutes out on the street approximately halfway between Suzette's and Owens's homes.  He then recounted an encounter on the street in which "Little Snake" initiated a fight with a man and woman walking down the block whom "Little Snake" identified as "folks."  Defendant testified that he pulled "Little Snake" away from the man and told the couple to "go on."  Although Johnson and "Little Snake" argued with him about why he stopped the altercation, defendant testified that he felt it was not right for three men to "jump[] on the man and the woman."  While defendant was explaining his position to "Little Snake," Johnson walked away and went into Owens's house.

Defendant stated that he subsequently went to Owens's house and admitted that a fight started between him and Johnson.  However, he stated that Johnson started the fight because defendant chastised him for cursing in front of Big Leslie, when in response to defendant's request for money to buy a drink for Big Leslie Johnson said "f--k you and f--k the drink."  He testified that after he and Johnson had wrestled for a few moments he heard Big Leslie yell for them to stop, and he stopped fighting immediately.  Johnson stopped as well.  Defendant recognized that Big Leslie was very angry, so he left.  He maintained that Big Leslie did not ask him to go, however.

After leaving, defendant testified that he returned to Suzette's house to call a cab.  However, no one answered the door, so he went back down the front steps to the street.  As he closed the gate to Suzette's yard, Williams and the defendant walked up to him.  Johnson told defendant "Man, you ain't sh-t.  You know what I'm saying?  F--k them folks."  After this the two of them began to push each other, until Williams stepped between them.  The defendant told Williams to take Johnson home, because he was drunk.  He stated that he and Johnson had known each other for about a year and a half and were friends.

After this encounter, defendant testified that he walked over to 107th place and got in a cab and went to his sister's house.  The next morning another sister of his who was coming through Chicago on the way to Milwaukee brought him up to Milwaukee with her because there were a lot of jobs there.  

Defendant testified that Detective Cross had come up to Milwaukee some months later to bring him back to Chicago.  When defense counsel asked defendant whether he had told Cross that he had a lawyer the court sustained the State's objection and struck the defendant's answer of "no."  The court went on to admonish the jury to "disregard that question, and you recall I instructed you to disregard Detective Cross' statement at the end of the testimony.  Those remarks are stricken from the record, and the jury must disregard."  Defendant subsequently testified that he returned to Chicago voluntarily and that when he was brought to Area 2 he spoke with Detective Cross and a State's Attorney.  

Defendant testified that he was not aware that the victim had been shot until a few days before Detective Cross came to Milwaukee to bring him back to Chicago.  He also stated that he was not in a gang at the time of the incident.  He admitted he had previously been a member of the "MC's" or "Mickey Cobras," which was part of the "five," but stated that since he was no longer an MC at the time of the crime, Johnson's saying "f--k the five" did not mean anything to him.  He stated that he knew Johnson to be a member of the Blackstones street gang, which was in the same "nation" as the MC's.

In rebuttal the State called Cybil Thomas.  Thomas, a former Assistant State's Attorney, testified that she interviewed the defendant when he was returned to Chicago from Milwaukee in August 1995.  She identified the defendant in court as the person with whom she spoke, and stated that in the course of the interview he told her that at the time he left for Milwaukee he knew that the victim had been shot and that he had been implicated in the murder.  The State also offered certified statements of conviction indicating that the defendant had two convictions for the felony offense of possession of controlled substance with intent to deliver, and one prior conviction of the felony offense of burglary.  

The docket sheet indicates that the jury retired to begin its deliberations at 6:30 p.m. on January 21.  The jury sent out notes to the court at 7:50 p.m. and 8:15 p.m. requesting, respectively, (1) a transcript of the State's Attorney's testimony regarding her interview with the defendant in 1995, and (2) a transcript of the interview itself.  Both requests were denied.  Later that same evening, the court brought the jury back into court without defense counsel being present.  (Although the time is not indicated in the record, defendant and the State both represent in their briefs to this court that the jury was returned at "around" 10:30 p.m.)  When the jury had arrived in court, the record reveals that the court inquired as follows:

"THE COURT:  Good evening, folks.  Will your foreperson please rise?  Sir, you are the foreperson?

"A JUROR:  Yes, I am.

"THE COURT:  Your name, please?

"A JUROR:  Kevin Moony.

"THE COURT:  Mr. Moony, do you feel with further deliberations this evening you'll be able to reach a verdict?

"A JUROR:  I think so.

"THE COURT:  Mr. Moony, I'll ask that you and the fellow jurors retire to the jury room.  We'll call you out shortly.  Please continue to deliberate."

Subsequently, at 10:46 p.m., the court requested the Sheriff to bring the jury back into open court, apparently in order to sequester them for the evening.  The Sheriff informed the court that he had been informed that the jury was signing a verdict at the time, at which point defendant moved for a mistrial based on the fact that defense counsel had not been present when the court brought the jury out for its earlier inquiry and "basically [giving] a Prim instruction to the jury."  

The court stated that what it did could not be considered an instruction because it was not given to the jury in writing.  The court also noted that the entirety of its communication with the jury was an inquiry whether the jury could reach a verdict that evening, and that the last communication that the court had received from defense counsel was that counsel "did not wish to return to the courtroom this evening."  Defense counsel responded that its last communication with the court was that the court "should lock them up," and that counsel believed that the court intended do so.  Counsel stated that he and co-counsel were nearby having dinner, and could have returned within minutes.
(footnote: 1)  He stated further that he telephoned someone (he believed it was a sheriff) and informed him that he and co-counsel were on their way back to the courtroom.

The court denied the mistrial request, noting that the defendant was personally present when it brought the jury back (at the alleged time of 10:30 p.m.).

The jury returned a verdict of guilty of first degree murder.  The jury was polled, and all jurors indicated that this was their verdict. 

The cause was continued until March 11, at which time the court denied defendant's motion for judgment of acquittal and/or new trial and sentenced defendant to a prison term of 43 years.  In sentencing defendant the court noted the jury's rejection of defendant's trial testimony; noted that defendant's previous felony convictions had not deterred him (in fact, defendant was on mandatory supervised release at the time of the murder); found that the incident was in part motivated by rival gang membership; and noted that defendant had shot the victim in the back.  The court found "very little mitigation about this conduct" and found that defendant was "not capable of rehabilitation at *** age 27."

Defendant appeals, contending that he should receive a new trial because (1) the court's communication with the jury was outside of the presence of defense counsel and was coercive, and (2) because of Detective Cross's testimony that he had invoked his right not to speak to the police outside of the presence of his attorney.  In the alternative, defendant argues that the sentence imposed by the trial court in this case represents an abuse of the court's discretion and requests that we remand for resentencing or reduce defendant's sentence pursuant to our authority under Supreme Court Rule 615(b)(4).  We reverse and remand for a new trial because of the trial court's communication with the jury.

ANALYSIS

Defendant's first complaint is that his trial was tainted by the trial court's communication with the jury outside the presence of defense counsel.  As noted above, we find that this constituted error entitling defendant to a new trial. "A criminal defendant has a constitutional right to a public trial, and to appear and participate 
in person and by counsel 
at all proceedings that involve his substantial rights."  (Emphasis in original.)  
People v. McDonald, 
168 Ill. 2d 420, 459, 660 N.E.2d 832, 849 (1995); accord, 
People v. Kliner, 
No. 81314, slip op. at 54-55 (December 3, 1998); 
People v. Childs, 
159 Ill. 2d 217, 227, 636 N.E.2d 534, 538 
(1994); People v. Harris, 
294 Ill. App. 3d 561, 568, 691 N.E.2d 80, 85 (1998).  Jury deliberations are a critical stage of trial which involve substantial rights, triggering the defendant's right to be present and participate in person and by counsel.  
Kliner, 
slip op. at 55 ("the trial judge communicated with the jury outside of defendant's presence during jury deliberations, which are a critical stage of trial affecting defendant's substantial rights"); 
McDonald, 
168 Ill. 2d at 459-

60, 660 N.E.2d at 849 ("this 
ex parte 
communication between the judge and the jury deprived defendant of his constitutional rights to be present at and to participate in a critical stage of trial"); 
Harris, 
294 Ill. App. 3d at 568, 691 N.E.2d at 85 ("Jury deliberations are a critical stage of trial and involve substantial rights"); see also 
Childs, 
159 Ill. 2d at 227, 636 N.E.2d at 538 (referring to "communication between the judge and the jury after the jury has retired to deliberate" as implicating "fundamental rights").  There is no question that defense counsel was not present during the communication between the court and the jury, which impinged upon defendant's right to be represented by counsel during all critical stages of the proceedings.  "Because an 
ex parte 
communication between a judge and a jury deprives a defendant of his constitutional rights to be present at and to participate for his protection in a critical stage of trial, the burden is on the State to prove beyond a reasonable doubt that the error was harmless."  
Childs, 
159 Ill. 2d at 228, 636 N.E.2d at 539; accord, 
Kliner, 
slip op. at 54; 
McDonald, 
168 Ill. 2d at 460, 660 N.E.2d at 849; 
Harris, 
294 Ill. App. 3d at 568, 691 N.E.2d at 85.
(footnote: 2)  The State's demonstration that any error was harmless must extend to any error in the communication itself, 
i.e., 
the State's burden is not met by a demonstration that defendant may not have been prejudiced by the isolated fact that the communication was 
ex parte.  
See 
Childs, 
159 Ill. 2d at 233-35, 636 N.E.2d at 541-42 (finding that the State failed to demonstrate that defendant was not prejudiced by the content of the communication itself.  The court did not focus on the 
ex parte 
nature of the communication in determining whether the communication had been harmful).

The State suggests that no violation of defendant's rights occurred since defendant was himself present during the communication with the jury, relying on language in 
McDonald 
and 
Childs 
that a defendant's fundamental rights are violated by any communication between the judge and the jury after the jury has retired to deliberate "except one held in open court and in defendant's presence."  
McDonald, 
168 Ill. 2d at 459, 660 N.E.2d at 849; 
Childs, 
159 Ill. 2d at 227, 636 N.E.2d at 538. We reject this argument.  A defendant has the right not only to be present in person, but also to be present 
by counsel 
at all critical stages of the proceedings against him including, as previously noted, communications between the court and the jury during deliberations.  
Kliner, 
slip op. at 54; 
McDonald, 
168 Ill. 2d at 459, 660 N.E.2d at 849; 
Childs, 
159 Ill. 2d at 227, 636 N.E.2d at 538; 
Harris, 
294 Ill. App. 3d at 568, 691 N.E.2d at 85.  The reason the criminal defendant has this right is "so that he may know what is being done, make objections, and take such action as he deems best to secure his rights and for his protection and defense."  
Childs, 
159 Ill. 2d at 227, 636 N.E.2d at 538.  This end is not adequately served by the mere presence of the defendant himself, who may or may not have any experience with, let alone expertise in, legal matters.  It is also necessary that counsel be present to aid and advise the defendant as to what course of action he should take, including whether to object, concur, or attempt to influence how the court addresses the jury.

Accordingly, the burden is on the State to demonstrate beyond a reasonable doubt that the court's communication with the jury was harmless.  Defendant contends that he was harmed by the court's communication with the jury because it interrupted the jury's deliberations and coerced them to reach a verdict more quickly than they otherwise would have.  The State seeks to characterize the communication as a mere harmless inquiry as to whether the jury would reach a verdict that evening.  We cannot concur in the State's characterization, and we cannot conclude that it is clear beyond a reasonable doubt that the jury would not have felt coerced by the communication to reach a verdict prematurely, without the benefit of full deliberations.  The court called the jury without any prompting by the jury, apparently on its own initiative.
(footnote: 3)  After inquiring of the foreperson whether he believed that the jury "with further deliberations this evening [would] be able to reach a verdict," the court returned the jury to the jury room, stating that it would "call [the jury] out shortly" and requesting that the jury "Please continue to deliberate."  Sixteen minutes later, the jury signed a verdict as the court was calling them back to open court.
(footnote: 4)  

Any judicial intervention into the jury's deliberations in which the court informs the jury as to the consequences of failure to reach a verdict by a certain time can be coercive.  Even merely informing the jury that it will be sequestered if it has failed to reach a verdict after a certain time can be coercive, although it has been held that whether such a communication will be found to be coercive depends on the length of time for which the jury subsequently deliberates.  See 
People v. Friedman, 
144 Ill. App. 3d 895, 903, 494 N.E.2d 760, 765 
(1986).  
There the reviewing court held that the trial court coerced a verdict by telling the jury that it would be sequestered after forty-five minutes.  In 
People v. Steidl, 
142 Ill. 2d 204, 
230-32, 
568 N.E.2d 837, 848 (1991) our supreme court held that by informing the jury that it would be taken to overnight lodging at 10:00 p.m. the trial court did not coerce a hasty verdict because the jury in fact deliberated for an additional 45 minutes thereafter.  
Steidl, 
142 Ill. 2d at 232, 568 N.E.2d at 848.  However, 
Steidl 
reaffirmed 
Friedman 
on the basis that in 
Friedman 
although the jury was informed it had 45 minutes before it would be sequestered, it returned a verdict in less than 5 minutes.  
Steidl, 
142 Ill. 2d at 232, 568 N.E.2d at 848.  The key to determining whether information about sequestration will be found to be coercive is the amount of time the jury deliberates thereafter.  See 
Steidl, 
142 Ill. 2d at 232, 568 N.E.2d at 848 (since the trial court's "'timely notice' [of the dinner and sequestration arrangements] was followed by 45 minutes of further deliberations, it did not prejudice defendant's rights to a fair trial"); 
Friedman, 
144 Ill. App. 3d at 903, 494 N.E.2d at 765 ("Notably brief deliberations [after a communication] invite an inference that the court's remarks were the primary factor in the procurement of the verdict");
 People v. Branch, 
123 Ill. App. 3d 245, 252, 462 N.E.2d 868, 873-74 (1984) (noting on review of trial court's comments to a deadlocked jury "the fact that the jury deliberated for 4 1/2 hours before hearing the challenged remarks, but for only 10 minutes thereafter, belies the State's assertion that they did not impose any pressure on the minority juror to heed the majority and thus to change his vote for the sole purpose of rendering a verdict").
(footnote: 5)  Cf. People v. Wooton, 
198 Ill. App. 3d 591, 
595, 
555 N.E.2d 1214,
 
1216 (1990) (distinguishing 
Friedman 
and 
Branch 
on the basis that in those cases "the notably brief deliberation after the court's remarks created an inference that the court's remarks were a primary factor in the procurement of a verdict").

In this case the jury returned its verdict approximately 15 minutes after the court's interruption, which would constitute grounds for reversal under 
Steidl, Friedman 
and 
Branch 
even if the court had merely neutrally informed the jury of the time at which it would be sequestered if no verdict had yet been reached and even if the burden were on defendant to prove prejudice.  In this case as noted above the burden is on the State to prove that defendant was 
not 
prejudiced beyond a reasonable doubt, because defendant was deprived of representation at the time the remark was made.  See 
Kliner, 
slip op. at 54; 
McDonald, 
168 Ill. 2d at 460, 660 N.E.2d at 849; 
Childs, 
159 Ill. 2d at 227-28, 636 N.E.2d at 539; 
Harris, 
294 Ill. App. 3d at 568, 691 N.E.2d at 85, discussed above.  

Even more overridingly, the communication in this case is different in 
kind 
from the communications in 
Steidl, Friedman, 
and 
Branch.  
Here the court did not neutrally inform the jury of the time at which it would be sequestered.  Rather, the court asked if the jury could reach a verdict that evening and, upon receiving an affirmative response, sent the jury back and informed it that it would be called out "shortly."  A reasonable inference for the jury to draw from this exchange is that it should be prepared to render its verdict when it was recalled.

The State attempts to justify the court's statement that it would "call [the jury] out shortly" on the basis that since "the hour was late, around 10:30 p.m., the court could have reasonably assumed that the jury would have a verdict within the next hour and a half, as the foreman stated he thought the jury could reach a verdict that night."  By this the State appears to characterize the court's statement not as an admonition to the jury to accelerate its deliberations, but as a prediction that the jury would return a verdict before midnight, consistent with its representation to the court.  However, this characterization by the State is not persuasive, particularly as the record reflects that the court did not wait until midnight, but rather instructed the bailiff to call the jury out approximately 15 minutes later, at 10:46.  More overridingly, the court did not say that it would await the verdict, but instead indicated that it would take the initiative in calling the jury out "shortly."  Thus the more likely inference, or at the very least an equally likely inference for the jury to have made from the exchange was an admonitory one, 
i.e., 
that it should be prepared to render a verdict "shortly," when the court called it out.
(footnote: 6)  The contention that the statement is susceptible of a possible non-coercive interpretation is beside the point, as the State has the burden not of demonstrating that the jury 
could 
have interpreted the statement innocently, but of demonstrating that the jury did 
not 
interpret the exchange coercively beyond a reasonable doubt.  See 
Childs, 
159 Ill. 2d at 227-28, 636 N.E.2d at 539, and the other authorities cited above.  Such a conclusion is untenable in this case.  

Moreover, in 
Steidl, Wooton, Friedman, 
and 
Branch 
the claims of jury coercion resulted from communications by the judge concerning his prospective arrangements for the jury's sequestration.  It is in this context that those cases focus on the passage of time in determining whether to treat the communications as coercive.  However, where the court 
overtly 
expresses a preference for the jury hasten its arrival at a verdict rather than merely advising it of its scheduled sequestration, even the passage of a longer duration following such an admonition might not 
cure 
such error.  See 
People v. Ferro, 
195 Ill. App. 3d 282, 551 N.E.2d 1378 (1990).  In that case the reviewing court reversed and remanded for a new trial because of the trial court's statement to the jury that it would be housed in a motel until it reached a verdict.  The court held this statement conveyed the message to the jury that it "must arrive at a verdict" (
i.e. 
could not deadlock) and thus held that the verdict was coerced notwithstanding that jury did not return a verdict until more than 1 1/2 hours after the communication.

In another case we might decline to consider the brevity of the jury's post-communication deliberation because the record does not show at what time the communication occurred.  Arguments made by an appellant which depend on facts not contained in the record are not sustainable on appeal.  
U.S. Minerals & Mining, Inc. v. Licensed Processors, Ltd., 
194 Ill. App. 3d 428, 434, 
551 
N.E.2d 661, 665
 
(1990) ("those issues which depend for resolution upon facts not in the record mandate affirmance"); 
Estate of Jacobs, 
189 Ill. App. 3d 625, 629, 
545 
N.E.2d 502, 504
 
(1989) ("Affirmance is dictated when crucial facts are omitted in the record").  However, in this case not only has the State in its brief failed to 
controvert 
defendant's representation as to the time at which the communication occurred, it has affirmatively 
used 
that representation to explain the trial court's statement that it would call the jury back "shortly," as noted above.  This is virtually equivalent to a stipulation, and allows us to consider the matter notwithstanding that it is 
dehors 
the record.  See 
Mastrandrea v. Chicago Park Dist., 
259 Ill. App. 3d 897, 
899-

900, 
632 N.E.2d 1051
, 
1052 (1994) (court considered matters not of record because "statements made by the parties at oral argument reveal no actual dispute as to the facts necessary to resolve this issue"); 
Fleener v. Fleener, 
133 Ill. App. 2d 118, 120-21, 263 N.E.2d 879, 881 (1970) (appellee waived challenge to certification of transcript by basing one of her appellate arguments on the transcript which she sought to challenge).  
Cf. In re J.S., 
267 Ill. App. 3d 145, 151, 640 N.E.2d 1379, 1384 (1994) (matters outside the record cannot be considered by a court of review "absent a stipulation by the parties"); 
People v. Thomas, 
220 Ill. App. 3d 110, 
129, 
580 N.E.2d 1353, 1366 (1991) (same).  Accordingly, we shall consider the information.

The State contends that even if we are to conclude that the communication was erroneous, any error was harmless because of the overwhelming evidence against defendant.  We disagree.  As previously noted, this is constitutional error affecting the fundamental right to trial by jury.  As shall be discussed below, there is some question whether it is even appropriate to speak in terms of such an error being harmless because of the degree of evidence of a defendant's guilt.  Even assuming that such an error could be harmless, the burden is on the State to prove that the error is harmless beyond a reasonable doubt (
Kliner, 
slip op. at 54; 
McDonald, 
168 Ill. 2d at 460, 660 N.E.2d at 849; 
Childs, 
159 Ill. 2d at 227-28, 636 N.E.2d at 539; 
Harris, 
294 Ill. App. 3d at 568, 691 N.E.2d at 85), and the State has not shown the evidence of defendant's guilt to be overwhelming.  There is no physical evidence linking the defendant to this crime.  The only witness to the shooting was Williams.
(footnote: 7)  Although defendant left the jurisdiction the day after the killing, it is not clear that the jury believed Thomas's testimony that the defendant told her that he had done so because he knew that the victim had been shot and that he (defendant) had been implicated in the murder, as evidenced by its two notes requesting additional evidence on this issue.
(footnote: 8)  Page did see the defendant running away from Williams and the victim and heard the victim yelling at defendant to go get a "strap" (which she understood to mean a gun), but she never saw the defendant return from across the street and she never saw a gun in his possession.

Moreover, Williams's testimony is not unblemished.  His trial testimony that "on the five" was not gang-related was contradicted not only by Page and Roberts, but also by Detective Cross's testimony regarding what Williams had told him on the evening of the shooting.  Page also directly contradicted Williams's testimony that the decedent was not in a gang.  We need not go into the various other inconsistencies in details which defendant has highlighted (both at trial and on appeal) in order to conclude that although there is sufficient evidence to convict the defendant, the evidence was not so overwhelming as to satisfy the test for prejudicial error applicable to these facts which would require such a showing beyond a reasonable doubt.

Additionally, on a more fundamental level, where the State has failed to meet its burden of showing the communication was not coercive a defendant's conviction arguably should not be upheld even if the evidence against him is otherwise overwhelming, since this error involves a serious encroachment upon a defendant's right to trial by jury.  Errors which "abridge[] the defendant's constitutional right to a trial by a fair and impartial jury *** cannot be disposed of by the harmless-error rule[.]  ***  The right to a trial by an impartial tribunal is so basic that a violation of the right requires a reversal."  
People v. Cole, 
54 Ill. 2d 401, 
411, 
298 N.E.2d 705,
 
711 (1973).  It has specifically been held that an allegation that a trial court coerced the jury's verdict by a comment during its deliberations implicates "[t]he right to a fair trial by an impartial jury."  
People v. Palmer, 
125 Ill. App. 3d 703, 
712, 
466 N.E.2d 640,
 
647 (1984) (citing 
Cole).  
See also 
People v. Gregory, 
184 Ill. App. 3d 676, 680-81, 540 N.E.2d 854, 857 
(1989), 
stating 

"'[t]he integrity of the jury's verdict must be protected from coercion, duress or influence.'  Thus, a court's judgment must be reversed and the cause remanded when, taken in context and considering all the circumstances of the case, its supplemental instruction to a jury has the effect of coercing jurors into surrendering views conscientiously held.  'A verdict hastened by the action of the judge, however worthy the motive, cannot be the result of that deliberation which the law guarantees.'"  (Citations omitted.)   
Gregory, 
184 Ill. App. 3d at 680-81, 540 N.E.2d at 857.

In 
Childs 
our supreme court stated that 

"upon review of a conviction the question is not whether guilt can be discerned from a record but 'whether guilt has been found by a jury according to the procedure and standards appropriate for criminal trials * * *.  From presuming too often all errors to be "prejudicial," the judicial pendulum need not swing to presuming all errors to be "harmless" if only the [reviewing] court is left without doubt that one who claims its corrective process is, after all, guilty.'" 

Childs, 
159 Ill. 2d at 231, 636 N.E.2d at 540, quoting 
Bollenbach v. United States, 
326 U.S. 607, 614-15, 66 S.Ct. 402, 406, 90 L.Ed. 350, 355 (1946).  Although we are aware of no authority directly on point, we would be hesitant to conclude that a showing that a trial court had coerced a verdict could be labelled "harmless" simply because it appeared that the defendant would more than likely have been found guilty if he had received a fair trial.

We recognize, of course, that reviewing courts have found trial court communications with juries to be harmless.  However, so far as we are aware, this result has never been reached on the basis that although the communication was coercive, the evidence was overwhelming.  Rather, when communications have been found harmless, it has been because the communication did not have a coercive effect.  
E.g.  Steidl, 
142 Ill. 2d at 232, 568 N.E.2d at 848 (no basis for an inference that the trial court's remarks were coercive); 
Wooton, 
198 Ill. App. 3d at 
595, 
555 N.E.2d at 1216 ("no inference can be drawn that the trial court's remarks affected the jury's decision making process").  Even in cases in which reviewing courts have disposed of other issues on the basis that overwhelming evidence of defendant's guilt rendered the errors harmless, jury communications have not been so dealt with.  
E.g., People v. Watkins, 
293 Ill. App. 3d 496, 688 N.E.2d 798 (1997) (admission of evidence harmless because of overwhelming evidence; no such analysis made in coercion issue); 
People v. Marshall, 
165 Ill. App. 3d 968, 521 N.E.2d 538 (1988) (State's closing argument was harmless because of overwhelming evidence; no such analysis in coercion issue); 
People v. Sanders, 
37 Ill. App. 3d 236, 345 N.E.2d 757 (1976) (improper question by State harmless because of overwhelming evidence; no such analysis in coercion issue).

Defendant also contends he is entitled to a new trial because of Detective Cross's statement that when he was transporting defendant back to Chicago after having given him his 
Miranda 
warnings, the defendant stated that he had a lawyer and did not wish to speak with the police.  The State essentially concedes that the statement was error, but contends that defendant has waived his appellate challenge thereto by failing to mention the statement in his post-trial motion, and also urges that the error was harmless because of the overwhelming evidence of defendant's guilt.  Although the State is correct that improper evidence regarding a defendant's post-arrest, post-

Miranda 
silence or statement regarding a lawyer can be harmless error (
People v. Patterson, 
154 Ill. 2d 414, 466-67, 610 N.E.2d 16, 40 (1992) (silence); 
People v. Lucas, 
132 Ill. 2d 399, 432-

33, 548 N.E.2d 1003, 1016-17 (1989) (statement that defendant had requested a lawyer)), we do not find the evidence of defendant's guilt to have been overwhelming, as explained above.  However, we note that the court did immediately instruct the jury to disregard the answer and admonished the detective to answer the question asked.  Generally, the prompt sustaining of an objection by a trial judge is sufficient to cure any error in a question or answer before the jury.  
People v. Alvine, 
173 Ill. 2d 273, 296, 671 N.E.2d 713, 723 (1996); 
People v. Redd, 
173 Ill.2d 1, 29, 670 N.E.2d 583, 597 (1996); 
People v. Hobley, 
159 Ill. 2d 272, 316, 637 N.E.2d 992, 1011 (1994).

In any event, we have already determined that defendant is entitled to a new trial because of the trial court's coercive communication with the jury.  Accordingly, we need not determine what effect the detective's improper statement might have had, standing alone.  We are confident that the error will not recur in defendant's retrial.

Finally, we note that even had we affirmed defendant's conviction we would reverse and remand for the trial court to clarify whether defendant's sentence was based on its erroneous statement that the shooting was the result of gang rivalry.

We recognize initially that defendant has waived his sentencing challenges.  Just as a defendant must file a post-

trial motion raising the errors which occurred at trial for those errors to be preserved for appellate review (
People v. Enoch, 
122 Ill. 2d 176, 522 N.E.2d 1124 (1988)), he must also file a motion to reconsider his sentence in order to preserve a challenge to his sentence for appellate review.  730 ILCS 5/5-8-1(c) (West 1994); 
People v. Reed, 
177 Ill. 2d 389, 390, 686 N.E.2d 584 (1997).  Defendant represented in his brief to this Court that the sentencing issues were preserved for review because he did file a motion to reconsider his sentence in the trial court.  The record before us does not contain the alleged motion, however, although it does contain a motion to reconsider sentence for an apparently unrelated defendant (James Peevey) in an apparently unrelated case (no. 94--CR--20070).  Nor does the trial court's docket sheet reflect any ruling on or filing of such a motion.  Although we afforded appellate counsel for defendant the opportunity to supplement the record with the motion to reconsider sentence actually filed in this case, he has failed to do so.  Accordingly, defendant's appellate challenges to his sentence are waived.  
Reed, 
177 Ill. 2d at 390, 686 N.E.2d at 584.

However, an allegation that a trial court relied upon an improper factor in sentencing implicates a defendant's fundamental right; we will reach such allegations notwithstanding waiver.  
People v. Whitney, 
297 Ill. App. 3d 965, 
969, 
697 N.E.2d 815
, 
818 (1998).  Although generally a sentence within the range allowed by the legislature
(footnote: 9) will not be overturned unless the court has abused its discretion (
People v. Meras, 
284 Ill. App. 3d 157, 166, 671 N.E.2d 746, 753 (1996)), where a trial court mentions an improper or incorrect factor in sentencing, we must reverse and remand for the trial court to determine whether the improper factor affected the sentence defendant received unless we can conclude from the record that "the weight placed on such an improperly considered aggravating factor was so insignificant it resulted in no increase in the defendant's sentence."  
Whitney, 
297 Ill. App. 3d at 
969, 
697 N.E.2d at 818; accord, 
People v. Conover, 
84 Ill. 2d 400, 405, 419 N.E.2d 906, 909 (1981) (remanding for reconsideration of sentence because "the trial court *** improperly considered *** an aggravating factor in sentencing and because we cannot determine how much weight that factor was accorded").  

In this case the court stated, 
inter alia, 
that "In spite of what you urge, [defense counsel], I find that this incident was motivated by several things, including gang membership.  I recall at the gathering that [defendant] attended before the fatal encounter of the victim, there were words such as 'Up the Five,' or words to that effect.  There was evidence that this court after hearing that testimony, much of what motivated [defendant] was a Folks versus People syndrome, membership in rival gangs; frilled perhaps by alcohol, 40 ouncers, were consumed that night by both sides of the fray if you will.  Notwithstanding any motives or passions that may have arisen, there is no doubt that [defendant] shot down an unarmed man in the back with a rifle."

The court's statement that the shooting was motivated by membership in rival gangs was contrary to the evidence.  The only evidence was that defendant and the victim were both "5's" and that they were going to fight each other 
notwithstanding 
a 
common 
gang affiliation, not because of an affiliation with rival gangs.  Based upon this record we cannot say that this factor played an insignificant part in the trial court's calculation of defendant's sentence.  The court spent more time discussing gang motive than any other factor.  The State notes that after its discussion of the gang rivalry motivation the court went on to state that "Notwithstanding any motives or passions that may have arisen, there is no doubt that [defendant] shot down an unarmed man in the back with a rifle."  However, this alone does not make it clear that the court did not consider defendant's motivations, which it had just extensively discussed.  Thus, we would be required to reverse and remand on the sentencing issue even had we affirmed defendant's convictions.

CONCLUSION

For the reasons above stated, we reverse and remand to the Circuit Court of Cook County for a new trial.

So ordered.

McNULTY and COUSINS, JJ., concur.

FOOTNOTES
1: 
 Although not reflected in the record, defendant contends on appeal that his defense team "left instructions with the sheriff that they were close by and could return within minutes."

2:  
But see 
People v. Steidl
, 142 Ill. 2d 204, 231, 568 N.E.2d 837, 847-

48 (1991), which appears to leave the burden on the defendant to prove prejudice from an 
ex
 
parte
 communication between the court and the jury.  However, 
Childs
, 
McDonald
 and 
Kleiner
 have manifestly abandoned such a mode of analysis.

3:  
I.e.
, the record does not reflect that the court was responding to a jury note, nor is there a record of any conversation between the court, the State, and defense counsel prior to the court's intervention.

4:  
In actuality, the jury must have deliberated for somewhat less than the 16 minutes which passed between 10:30 p.m., when the court called the jury back to court, and 10:46 p.m., when the court instructed the Sheriff to return the jury to court a second time and was told that the verdicts were being signed.  The jury could not have been deliberating during the time that it was communicating with the court, during the time thereafter when it was being returned to the jury room, or during the time that it took for court personnel to bring to the Sheriff the information that the jury was signing a verdict.  Accordingly, the actual amount of deliberations after the communication with the court was somewhat less than 16 minutes.

5: 
 The State distinguishes 
Branch
 on the basis that that case involved an instruction to a jury which had revealed itself to be deadlocked.  Although this point is accurate with respect to 
Branch
, the 
Friedman
 jury had not informed the court that it was deadlocked and thus 
Friedman
 cannot be differentiated on this basis, nor can 
Steidl
.

6:  
We also note that although the State has not so argued, our result would not change if it were suggested that the jury could have interpreted the court's statement that it would call the jury out shortly as meaning that the jury would be seques-tered for the evening.  First, notwithstanding comments by the court and counsel outside the presence of the jury, there is no indication in the record that the jury was ever told that sequestration was even a possibility.  Secondly, even if the State could somehow demonstrate that the statement was understood by the jury as referring to sequestration, we still could not find the statement harmless because of the brevity of the jury's subsequent deliberations, as previously discussed.  See 
Steidl
,
 
Friedman
, 
Branch
, 
Childs
, and the other authorities discussed in the text. 

7:  
Roberts and Page only corroborated that there was a fight between the victim and the decedent inside the Owens household; neither Roberts nor Page saw the shooting nor even any fight between defendant and the victim outside.  Although Roberts testified that Page said she had seen defendant and the victim fighting, Page specifically denied having seen a fight and denied having so told the others.  Rather, she said that she had told the others that it seemed as if they had been fighting.

8:  
We reject defendant's contention that 
People v. Ehlert
, 274 Ill. App. 3d 1026, 1035, 654 N.E.2d 705, 711 
(1995) stands for the proposition that in general, jury notes demonstrate that the jury considers the evidence to be closely balanced.  Although 
Ehlert
 makes a general statement along those lines ("the length of the jury deliberations and the jury's note demonstrate the closely balanced nature of the evidence"), the jury note to which the court referred in that case was a deadlock note.  However, the jury's request for a transcript of the interview between defendant and Thomas would fairly appear to support the conclusion that the jury had not reached a final conclusion whether defendant or Thomas was to be believed.

9:  
Defendant's 43 year sentence in this case was within the statutory range of 20 to 60 years for the offense of first degree murder.  730 ILCS 5/5-

8-1(a)(1)(a) (West 1994).